# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA



**RECEIVED**

FEB 0 3 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

*In re* Grand Jury Subpoenas Nos. ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮

Case No. 1:26-mc-00012-JEB

**FILED UNDER SEAL**

## THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S MOTION TO QUASH SUBPOENAS

Pursuant to Federal Rule of Criminal Procedure 17(c), the Board of Governors of the Federal Reserve System ("the Board") moves to quash the grand jury subpoenas numbered ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ The bases for this motion are set forth in the Memorandum in Support filed herewith. The Board also respectfully requests an oral hearing on this motion pursuant to Local Criminal Rule 47(f).[1]

Dated: Washington, D.C.
February 3, 2026

Respectfully submitted,

*[signature]*

Jeffrey S. Bucholtz (Bar ID 452385)
JBucholtz@kslaw.com
Robert K. Hur (*pro hac vice* pending)
RHur@kslaw.com
Leah B. Grossi (Bar ID 1024022)
LGrossi@kslaw.com
Nicholas A. Mecsas-Faxon (Bar ID 1779269)
NMecsas-Faxon@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

---

[1] Pursuant to Local Criminal Rules 6.1 and 49(e)(4), this motion and all accompanying papers are filed under seal without an accompanying motion to seal.

Andrew Z. Michaelson (*pro hac vice*
forthcoming)
AMichaelson@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Attorneys for the Board of Governors of the*
*Federal Reserve System*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 3, 2026, I caused the foregoing Motion to Quash Subpoenas, and exhibits thereto, to be filed in person with the Clerk for the U.S. District Court for the District of Columbia.  I further certify that I caused the same to be served via U.S. Postal Service First Class Mail on the following members of the United States Attorney's Office for the District of Columbia:

Judge Jeanine Ferris Pirro, United States Attorney for the District of Columbia
Carlton J. Davis, Special Counsel
Steven Vandervelden, Special Counsel
Patrick Henry Building
601 D Street NW
Washington, D.C. 20530

Leah B. Grossi

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

*In re* Grand Jury Subpoenas Nos.
███████████ and ███████

Case No. 1:26-mc-00012-JEB

**FILED UNDER SEAL**

## [PROPOSED] ORDER

Upon consideration of the Board of Governors of the Federal Reserve System's Motion to

Quash Subpoenas and the Memorandum in Support of the same, it is hereby

**ORDERED** that the Motion be GRANTED; and it is further

**ORDERED** that Grand Jury Subpoenas Numbers ██████████ and

███████████ are hereby quashed and the Board of Governors of the Federal Reserve

System shall have no obligation to respond to either subpoena.

Dated: _____, 2026

_____

United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*In re* Grand Jury Subpoenas Nos. █████ and █████

Case No. 1:26-mc-00012-JEB

**FILED UNDER SEAL**

## MEMORANDUM IN SUPPORT OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S MOTION TO QUASH SUBPOENAS

Jeffrey S. Bucholtz (Bar ID 452385)
JBucholtz@kslaw.com
Robert K. Hur (*pro hac vice* pending)
RHur@kslaw.com
Leah B. Grossi (Bar ID 1024022)
LGrossi@kslaw.com
Nicholas A. Mecsas-Faxon (Bar ID 1779269)
NMecsas-Faxon@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

Andrew Z. Michaelson (*pro hac vice*
forthcoming)
AMichaelson@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Attorneys for the Board of Governors of the
Federal Reserve System*

## TABLE OF CONTENTS

BACKGROUND ..................................................................................................................... 1

    A.    The Federal Reserve Act Affords the Federal Reserve Independence in the
           Setting of Monetary Policy. ................................................................................... 2

    B.    President Trump Pressures the Federal Reserve to Lower Interest Rates. ............. 3

    C.    The USAO Serves Subpoenas on the Board. ......................................................... 10

    D.    Current and Former Government Officials Condemn the USAO's Issuance
           of Subpoenas to Influence Monetary Policy. ........................................................ 13

ARGUMENT .......................................................................................................................... 14

I.    A SUBPOENA MUST BE QUASHED WHERE ITS "DOMINANT PURPOSE"
    IS IMPROPER. .................................................................................................................. 14

II.    THE DOMINANT PURPOSE OF THE SUBPOENAS IS IMPROPER
    HARASSMENT TO PRESSURE THE FEDERAL RESERVE TO LOWER
    INTEREST RATES. ........................................................................................................... 20

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Admin. Subpoena No. 25-1431-019*,
   800 F. Supp. 3d 229 (D. Mass. 2025)........................................................................17

*Am. Bankers Ass'n v. United States*,
   932 F.3d 1375 (Fed. Cir. 2019) ................................................................................2

*Branzburg v. Hayes*,
   408 U.S. 665 (1972)................................................................................................15

*Cook v. Trump*,
   2025 WL 2607761 (D.D.C. Sept. 9, 2025)........................................................7, 22

*Cook v. Trump*,
   2025 WL 2654786 (D.C. Cir. Sept. 15, 2025)...........................................................7

*Dep't of Com. v. N.Y.*,
   588 U.S. 752 (2019)................................................................................................24

*Ealy v. Littlejohn*,
   569 F.2d 219 (5th Cir. 1978) ..................................................................................16

*Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*,
   443 U.S. 340 (1979)..................................................................................................2

*In re Grand Jury 95-1*,
   59 F. Supp. 2d 1 (D.D.C. 1996)..........................................................................1, 16

*In re Grand Jury Subpoena*,
   175 F.3d 332 (4th Cir. 1999) .................................................................1, 16, 17, 20

*In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*,
   767 F.2d 26 (2d Cir. 1985) ...............................................................16, 17, 18, 23

*In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*,
   2026 WL 60793 (N.D.N.Y. Jan. 8, 2026)...............................................................15

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024)................................................................................................18

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
   2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ....................................................18

*In re Subpoena Duces Tecum No. 25-1431-016*,
   2025 WL 3562151 (W.D. Wash. Sept. 3, 2025)......................................................18

*Trump v. Cook,*
    U.S. No. 25A312 ........................................................................................................8

*Trump v. Vance,*
    480 F. Supp. 3d 460 (S.D.N.Y. 2020) ......................................................................23

*Trump v. Wilcox,*
    145 S. Ct. 1415 (2025)..........................................................................................2, 19

*United States v. Calk,*
    87 F.4th 164 (2d Cir. 2023) .....................................................................................15

*United States v. Comey,*
    2025 WL 3266932 (E.D. Va. Nov. 24, 2025).........................................................10

*United States v. R. Enters., Inc.,*
    498 U.S. 292 (1991).........................................................................................*passim*

*United States v. Sitzmann,*
    74 F. Supp. 3d 96 (D.D.C. 2014) ..............................................................16, 17, 18

*United States v. Zubaydah,*
    595 U.S. 195 (2022)................................................................................................24

**Statutes**

12 U.S.C. § 222..............................................................................................................2

12 U.S.C. § 225b(a)(1) ................................................................................................11

12 U.S.C. § 241...........................................................................................................2, 3

12 U.S.C. § 242................................................................................................................3

12 U.S.C. § 244..............................................................................................................2

12 U.S.C. § 263..............................................................................................................2

**Other Authorities**

*A Sitting President's Amenability to Indictment and Criminal Prosecution,* 24
    U.S. Op. Off. Legal Counsel 222 (Oct. 16, 2000) ...................................................19

Robert H. Jackson, *The Federal Prosecutor,* 31 J. Crim. L. & Criminology 3
    (1940)..................................................................................................................16, 19

Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency
and Beyond,* 93 Minn. L. Rev. 1454 (2009) ...............................................................3

Br. of the United States as Amicus Curiae, *First Choice Women's Resource Ctrs., Inc. v. Platkin*, U.S. No. 24-781 ..................................................................................20

Br. for Petitioner, *Trump v. Vance*, 591 U.S. 786 (2020) ..................................................................................................19

Oral Arg. Tr., *Trump v. Cook*, U.S. No. 25A312 ....................................................................................................19

On January 9, 2026, the United States Attorney's Office for the District of Columbia (the "USAO") served two grand jury subpoenas (the "Subpoenas") on the Board of Governors of the Federal Reserve System (the "Board"). The purpose of the Subpoenas is to dictate the Federal Reserve's setting of monetary policy—specifically, to harass, pressure, and punish the Federal Reserve and Chair Jerome Powell until they set monetary policy the way the President wants. Congress, however, afforded the Federal Reserve independence in the setting of monetary policy, and it did so precisely to insulate it from this sort of political pressure. Thus the USAO, through abuse of the criminal process, seeks to help the President achieve indirectly what the law prohibits him from doing directly. Grand jury investigations must not be launched out of "malice or an intent to harass," *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991), and courts will quash a grand jury subpoena where its "dominant purpose" is improper, *e.g.*, *In re Grand Jury Subpoena*, 175 F.3d 332, 340 (4th Cir. 1999); *accord In re Grand Jury 95-1*, 59 F. Supp. 2d 1, 15–16 (D.D.C. 1996). That standard is easily satisfied here, and the Court should quash the Subpoenas.[1]

## BACKGROUND

In many cases, "a party who desires to challenge a grand jury subpoena . . . may have no conception of the Government's purpose." *R. Enters.*, 498 U.S. at 300. But here the purpose is plain as day. The words and actions of the President and others in the Executive Branch make clear that the USAO issued the Subpoenas with the dominant, if not sole, intent to harass and intimidate the Federal Reserve and Chair Powell in order to allow the President to dictate the Federal Reserve's setting of monetary policy. The President wants to lower interest rates, but the law denies him the power to do so. The USAO's purpose in issuing the Subpoenas is to assist the

---

[1] The Board initially filed a substantially similar motion to quash the Subpoenas and memorandum in support on January 29, 2026, and submits this memorandum in response to the Court's entry of a Minute Order, on February 2, 2026, concerning the use of footnotes.

1

President by abusing the grand jury process to pressure the Federal Reserve to surrender its independence to conduct the nation's monetary policy.

A.    **The Federal Reserve Act Affords the Federal Reserve Independence in the Setting of Monetary Policy.**

The Federal Reserve occupies a special position in the nation's government and economy. It "is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). The Federal Reserve System consists of the seven members of the Board, including the chair, and twelve regional Reserve Banks. *See* 12 U.S.C. §§ 222, 241, 244; *see also Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019).

The Federal Reserve Act also establishes the Federal Open Market Committee ("FOMC"), which consists of all members of the Board and five representatives from the regional Reserve Banks. 12 U.S.C. § 263(a). The FOMC directs the "open market operations" of the Reserve Banks, *id.* § 263(b), which involve "the purchase and sale of Government securities in the domestic securities market," *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 343 (1979). The Supreme Court has described this role of the FOMC as "the most important monetary policy instrument of the Federal Reserve System" given its "substantial impact on interest rates and investment activity in the economy as a whole." *Id.* at 343–44. At a high level, the FOMC's open market operations—together with the Board's control over the discount rate, the rate of interest on reserve balances, and reserve requirements—"alters the federal funds rate," which is "the interest rate at which depository institutions lend balances at the Federal Reserve to other depository institutions overnight," in turn "trigger[ing] a chain of events that affect other short-term interest rates, foreign exchange rates, long-term interest rates, the amount of money and credit, and, ultimately, a range of economic variables, including employment, output, and prices of goods and

2

services." Board of Governors of the Federal Reserve System, *Federal Open Market Committee*, https://www.federalreserve.gov/monetarypolicy/fomc.htm (last visited Jan. 25, 2026).

The Federal Reserve's control over monetary policy is uniquely shielded by law from influence by the individuals who hold elected office. Because of the Federal Reserve's "power to directly affect the short-term functioning of the U.S. economy by setting interest rates and adjusting the money supply," Congress "insulate[d]" it "from direct presidential oversight or control," as well as from congressional control, in certain ways. Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1474 (2009). Congress gave the Federal Reserve independence from congressional funding by authorizing it to levy assessments upon the Federal Reserve Banks. 12 U.S.C. § 243. Congress further secured the Federal Reserve's independence by providing Board members with 14-year terms and protecting Board members' tenure: While the President appoints the Board's members (subject to Senate confirmation), he cannot remove them absent cause. *Id.* §§ 241–42. And to further insulate the Federal Reserve from political pressure, Congress gave the Board independent authority to acquire buildings "as in its judgment alone shall be necessary" for the performance of its duties; to construct buildings as would be "suitable and adequate in its judgment"; to "maintain, enlarge, or remodel" buildings; and to have "sole control of such building or buildings." *Id.* § 243.

## B.    President Trump Pressures the Federal Reserve to Lower Interest Rates.

Dating back to his first term, President Trump has deployed a series of escalating steps to pressure and intimidate the Federal Reserve, seeking to exert control over its independent monetary policy decisions.

*Early attacks.* Chair Powell's term commenced in February 2018. Within months, then-President Trump repeatedly scolded the FOMC and Chair Powell for failing to lower interest rates:

3

- October 10, 2018: President Trump told reporters the Federal Reserve is "going **loco**" and that it is "so tight" and has "gone **crazy**." Christina Wilkie & Everett Rosenfeld, *Trump doubles down on Fed attacks, saying it's 'going Loco,'* CNBC (Oct. 11, 2018, at 10:34 ET), https://www.cnbc.com/2018/10/11/trump-doubles-down-on-fed-attacks-saying-its-going-loco.html. (All bold emphases are added unless otherwise indicated.)

- July 31, 2019: In response to the FOMC's refusal to aggressively cut rates, President Trump tweeted that "[a]s usual, Powell let us down" and claimed, "I am certainly not getting much help from the Federal Reserve!" Donald J. Trump (@realDonaldTrump), X (July 31, 2019, at 16:41 ET), https://x.com/realdonaldtrump/status/1156666164732473345.

- August 14, 2019: President Trump tweeted: "[O]ther countries say THANK YOU to **clueless Jay Powell and the Federal Reserve**." Donald J. Trump (@realDonaldTrump), X (Aug. 14, 2019, at 15:21 ET), https://x.com/realdonaldtrump/status/1161719409804808193.

- August 19, 2019: President Trump tweeted: "Our Economy is very strong, despite the **horrendous lack of vision** by Jay Powell and the Fed." Donald J. Trump (@realDonaldTrump), X (Aug. 19, 2019, at 11:26 ET), https://x.com/realdonaldtrump/status/1163472272612626433.

- August 21, 2019: President Trump tweeted: "The only problem we have is Jay Powell and the Fed." Donald J. Trump (@realDonaldTrump), X (Aug. 21, 2019, at 08:52 ET), https://x.com/realdonaldtrump/status/1164158321265451008.

- August 23, 2019: Amid a trade war with China, President Trump tweeted: "My only question is, **who is our bigger enemy, Jay Powell or Chairman Xi?**" Donald J. Trump (@realDonaldTrump), X (Aug. 23, 2019, at 10:57 ET), https://x.com/realdonaldtrump/status/1164914610836783104.

- September 11, 2019: President Trump tweeted that the Governors of the Board are "**Boneheads**" for not cutting rates. Donald J. Trump (@realDonaldTrump), X (Sep. 11, 2019, at 06:42 ET), https://x.com/realdonaldtrump/status/1171735692428419072.

- September 16, 2019: President Trump tweeted: "**Jay Powell & the Fed don't have a clue**." Donald J. Trump (@realDonaldTrump), X (Sep. 16, 2019, at 07:47 ET), https://x.com/realdonaldtrump/status/1173564172635914247.

- September 18, 2019: President Trump tweeted: "**Jay Powell and the Federal Reserve Fail Again**. No 'guts,' no sense, no vision!" Donald J. Trump (@realDonaldTrump), X (Sep. 18, 2019, at 14:25 ET), https://x.com/realdonaldtrump/status/1174388901806362624.

- October 1, 2019: President Trump tweeted: "As I predicted, **Jay Powell and the Federal Reserve have allowed the Dollar to get so strong, . . . . Fed Rate too high**. They are their own worst enemies, they don't have a clue. Pathetic!" Donald J. Trump

(@realDonaldTrump), X (Oct. 1, 2019, at 10:34 ET), https://x.com/realdonaldtrump/status/1179041970590748672.

- October 31, 2019: President Trump tweeted: **"People are VERY disappointed in Jay Powell and the Federal Reserve.** The Fed has called it wrong from the beginning, too fast, too slow." Donald J. Trump (@realDonaldTrump), X (Oct. 31, 2019, at 10:37 ET), https://x.com/realdonaldtrump/status/1189914333842681858.

- December 2, 2019: President Trump tweeted about **"the ridiculous policies of the Federal Reserve -** Which has called interest rates and quantitative tightening wrong from the first days of Jay Powell!" Donald J. Trump (@realDonaldTrump), X (Dec. 2, 2019, at 16:19 ET), https://x.com/realdonaldtrump/status/1201611943515017216.

- March 10, 2020: President Trump tweeted that **"[o]ur pathetic, slow moving Federal Reserve, headed by Jay Powell,** who raised rates too fast and lowered too late, should get our Fed Rate down to the levels of our competitor nations." Donald J. Trump (@realDonaldTrump), X (Feb. 11, 2020, at 11:39 ET), https://x.com/realdonaldtrump/status/1227271072535498754.

*Threat of termination.* In response to the Federal Reserve's decisions *not* to lower interest rates to his liking, and with the 2020 election looming, the President escalated the pressure by threatening to remove Chair Powell: During a press briefing on March 14, 2020, President Trump claimed he has the "right to remove" or "demote" Chair Powell because he is "not happy" with him. Jeff Cox, *Trump says he has the right to remove Powell as Fed chair but hasn't 'made any decisions' yet,* CNBC (Mar. 14, 2020, at 21:51 ET), https://www.cnbc.com/2020/03/14/trump-says-he-has-the-right-to-remove-powell-as-fed-chair-but-hasnt-made-any-decisions-

yet.html?msockid=08627ef31e5e65c114b8681a1f5c64b7. When the FOMC thereafter voted to cut interest rates to zero percent citing changing economic conditions related to the COVID-19 pandemic, President Trump changed his tune. *See* Press Release, Federal Reserve, Federal Reserve issues FOMC statement (Mar. 15, 2020 at 17:00 ET), https://www.federalreserve.gov/newsevents/pressreleases/monetary20200315a.htm. The President stated that he was "very happy" and "congratulate[d] the Federal Reserve." Paul LeBlanc, *Trump congratulates Federal Reserve for slashing interest rates: 'It makes me very*

*happy'*, CNN (Mar. 15, 2020, at 18:30 ET), https://www.cnn.com/2020/03/15/politics/trump-jerome-powell-fed-rate-cut.

*Resuming the attacks.*  Shortly after President Trump returned to office for his second term, he resumed his attempts to control the Federal Reserve's setting of monetary policy, launching more personal attacks and accusing the Federal Reserve and Chair Powell of acting with political motivations.

- April 4, 2025: President Trump posted on Truth Social: "CUT INTEREST RATES, JEROME, AND **STOP PLAYING POLITICS!**"   Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 4, 2025, at 11:08 ET), https://truthsocial.com/@realDonaldTrump/posts/114280322706682564.

- May 4, 2025: In an NBC interview, President Trump claimed that Chair Powell "**only keeps rates high because he just doesn't like me.**"  Andrea Shalal, *Trump says he won't remove Fed chair Powell, says good parts of economy are his doing*, Reuters (May 4, 2025, at 11:48 ET), https://www.reuters.com/world/us/trump-says-wont-remove-fed-chair-powell-before-term-ends-2026-tv-interview-2025-05-04/.

- June 18, 2025: President Trump told ABC News: "We have a stupid person, frankly, at the Fed. **He probably won't cut today. . . .  Am I allowed to appoint myself at the Fed?**  I'd do a much better job than these people." C-SPAN, President Trump Calls Fed Chair Powell Stupid (June 18, 2025), https://www.c-span.org/clip/white-house-event/president-trump-calls-fed-chair-powell-stupid/5165846. The same day, Trump posted on Truth Social "Too Late—Powell is the WORST. A real dummy, who's costing America $Billions!"  Donald J. Trump (@realDonaldTrump), Truth Social (June 18, 2025, at 23:56 ET), https://truthsocial.com/@realDonaldTrump/posts/114708015987777473.

*Admission of motive.*  President Trump has not hidden his motive for these attacks. He has boasted—truthfully—that he has been "nasty" in an effort to make the Federal Reserve submit to his demands for lower interest rates. Moreover, President Trump repeatedly pushed for Chair Powell's removal—assuredly so the President could replace him with someone more malleable to his will—threatening termination and brandishing a draft letter firing him:

- April 17, 2025: On Truth Social, President Trump stated that "Powell's termination cannot come fast enough." Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 17, 2025, at 06:12 ET), https://truthsocial.com/@realDonaldTrump/posts/114352766082542122.   He told

reporters that **if he wants Powell out, "he'll be out of there real fast**." Aamer Madhani, Christopher Rugaber & Josh Boak, *Trump suggests he can remove Fed Chair Powell and says he's 'not happy' with him over interest rates*, Associated Press (Apr. 17, 2025, 18:29 ET) https://apnews.com/article/trump-powell-federal-reserve-fed-termination-b6148c8048dda538a6ca3b5a270fd09e.

- June 12, 2025: To lawmakers and others at a bill-signing event, President Trump said that he **"may have to force something"** to get the Federal Reserve to lower interest rates and called Chair Powell a "numbskull" for not wanting to do so. Alex Gangitano, *Trump calls Jerome Powell 'Numbskull,' Says He May 'Force Something' on Fed*, The Hill (June 18, 2025), https://thehill.com/homenews/5346728-trump-jerome-powell-interest-rates/.

- June 19, 2025: On Truth Social, President Trump labeled Powell "truly one of the dumbest, and most destructive, people in Government," and asserted that "the Fed Board is complicit." Donald J. Trump (@realDonaldTrump), Truth Social (June 19, 2025, at 10:04 ET), https://truthsocial.com/@realDonaldTrump/posts/114710405985383754. At a White House event, President Trump said, **"I call him every name in the book trying to get him to do something."** He added, "I'm nasty, I'm nice – nothing works." Colby Smith & Tony Romm, *Fed's 'Wait and See' Approach Keeps It on Collision Course With Trump*, N.Y. Times (June 19, 2025), https://www.nytimes.com/2025/06/19/business/fed-interest-rates-trump-powell.html.

- June 20, 2025: President Trump posted on Truth Social: **"I've tried it all different ways.** I've been nice, I've been neutral, and I've been **nasty**, and nice and neutral didn't work! **He's . . . an obvious Trump Hater . . . . Maybe, just maybe, I'll have to change my mind about firing him?"** Donald J. Trump (@realDonaldTrump), Truth Social (June 20, 2025, at 17:58 ET), https://truthsocial.com/@realDonaldTrump/posts/114717929371967424.

- July 15, 2025: During a meeting with House Republicans, President **Trump waved a copy of a draft letter** firing Powell and later told reporters that he "talked about the concept of firing him. I said, 'what do you think?' Almost every one of them said I should." Maggie Haberman & Colby Smith, *Trump Has Draft of Letter to Fire Fed Chair. He Asked Republicans if He Should Send It*, N.Y. Times (July 19, 2025), https://www.nytimes.com/2025/07/16/us/politics/trump-powell-firing-letter.html.

For Governor Lisa Cook, the President went further, purporting to remove her from office until this Court entered a preliminary injunction and held that the President's attempted removal likely violates the Governors' statutory independence. *See Cook v. Trump*, ___ F. Supp. 3d ___, 2025 WL 2607761, at *4–12 (D.D.C. Sept. 9, 2025); *see also Cook v. Trump*, 2025 WL 2654786, at *1 (D.C. Cir. Sept. 15, 2025) (denying government's request for stay pending appeal); *Trump*

*v. Cook*, U.S. No. 25A312 (government's pending application to the Supreme Court for a stay pending appeal, on which the Court heard oral argument on January 21, 2026).

*Shifting tactics.*  As the first year of President Trump's second term continued, the President and his allies supplemented personal attacks with threats of an investigation or lawsuit purportedly related to the Federal Reserve's building renovations, this notwithstanding that the Federal Reserve Act granted the Federal Reserve unique control over its buildings and their maintenance to help insulate it from political pressure.  In criticizing the renovations and threatening investigation and litigation, the President and his allies continued to voice their express purpose of forcing Chair Powell's resignation because the Federal Reserve, under his leadership, was "too late" to lower interest rates:

- July 2, 2025:  William Pulte, director of the Federal Housing Finance Agency ("FHFA"),[2] posted on X an FHFA letter calling for Congress to investigate Chair Powell.    William Pulte (@pulte), X (July 2, 2025, at 11:43 ET), https://x.com/pulte/status/1940436083495620653.  Later that day, President Trump reposted on Truth Social a Bloomberg article outlining Mr. Pulte's call for an investigation into Powell. He wrote that, rather than face the investigation, "'**Too Late'** **should resign immediately**!!!" Donald J. Trump (@realDonaldTrump), Truth Social (July 2, 2025, at 18:10 ET), https://truthsocial.com/@realDonaldTrump/posts/114785927683921380.

- July 24, 2025: President Trump visited the Federal Reserve construction site, marking the first time a president has visited the Federal Reserve since 2006.  Rafael Nam, *Trump visits Federal Reserve and tussles with Jerome Powell in extraordinary moment*, Nat'l Pub. Radio (July 25, 2025 at 15:42 ET), https://www.npr.org/2025/07/24/nx-s1-5478922/trump-federal-reserve-renovation-jerome-powell. He met with Chair Powell and the two appeared before the press together.  When asked whether Chair Powell could say anything to make President Trump retract his criticisms, the President clapped Chair Powell on the back and said, **"Well, I'd love him to lower interest rates, but other than that, what can I tell you?"** *Id.*; *see also* Bloomberg Television, *Trump Clashes With Powell During Renovation Project Tour*, at 2:01 (YouTube, July 24, 2025), https://www.youtube.com/watch?v=YZ_d3NHVCAs. Later that day, when

---

[2] Mr. Pulte reportedly appeared at Mar-A-Lago brandishing a "wanted" poster of Chair Powell. Andrew Ackerman, Natalie Allison and Salvador Rizzo, *The Campaign to Persuade Trump to Investigate the Federal Reserve Chief*, Wash. Post (Jan. 12, 2026), https://www.washingtonpost.com/business/2026/01/12/jerome-powell-fed-chair-investigation/.

asked about his relationship with Chair Powell, President Trump said he felt "good about it," and stressed: "But I just want to see one thing happen, very simple, interest rates have to come down." *See Remarks: Donald Trump Speaks to Reporters After a Federal Reserve Tour - July 24, 2025*, at 10:05 (July 24, 2025), https://tinyurl.com/5xefnktk.

- July 31, 2025: On Truth Social, President Trump said Chair Powell is "**TOO LATE, and actually, TOO ANGRY, TOO STUPID & TOO POLITICAL, to have the job of Fed Chair.** He is costing our Country TRILLIONS OF DOLLARS, in addition to one of the most incompetent, or corrupt, renovations of a building(s) in the history of construction!" Donald J. Trump (@realDonaldTrump), Truth Social (July 31, 2025, at 07:11 ET), https://truthsocial.com/@realDonaldTrump/posts/114947541528857255.

- August 1, 2025: President Trump posted on Truth Social that "'**Too Late' Powell should resign . . . .**" Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 1, 2025, at 18:05 ET), https://truthsocial.com/@realDonaldTrump/posts/114955773655328634.

- August 12, 2025: President Trump claimed on Truth Social that he is "considering allowing a major lawsuit against Powell to proceed because of the horrible, and grossly incompetent, job he has done in managing the construction of the Fed Buildings." Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 12, 2025, at 09:44 ET), https://truthsocial.com/@realDonaldTrump/posts/115016089386029482.

- November 19, 2025: At a U.S.-Saudi Business Forum, President Trump stated that Chair Powell has "got some real mental problems" and "there's something wrong with him," adding, "**I'd love to fire his ass. He should be fired.** The guy's grossly incompetent and he should be sued for spending $4 billion to build a little building." President Donald J. Trump, Address at the U.S.-Saudi Investment Forum (Nov. 19, 2025).[3]

- December 10, 2025: After the FOMC voted to lower interest rates by 25 basis points, the President complained that the rate cut should have been "doubled" and that "[o]**ur rate should be much lower.**" He further called Chair Powell "a stiff." Kevin Breuninger, *Trump Says Fed Could Have 'At Least Doubled' Latest Interest Rate Cut*, CNBC (Dec. 10, 2025), https://www.cnbc.com/2025/12/10/trump-fed-interest-rates-powell.html.

- December 29, 2025: President Trump **announced a "gross incompetence lawsuit"** over the renovation. Robert Mackey, *Trump says he'd 'love to fire' Jerome Powell in latest attack on Fed chair*, The Guardian (Dec. 29, 2025, at 17:45 ET),

---

[3] The "$4 billion" number in this statement is not accurate—the Federal Reserve's most recent budget for the construction estimates a total cost of approximately $2.5 billion. *See* Bd. of Govs. of the Fed. Rsrv. Sys., Updated 2025 Board Budget, 18 (2024), https://www.federalreserve.gov/foia/files/2025boardbudget.pdf.

https://www.theguardian.com/business/2025/dec/29/trump-jerome-powell-latest-attack-fed-chair.

## C.    The USAO Serves Subpoenas on the Board.

President Trump has made clear that he views Chair Powell as his enemy *and* that he expects the Department of Justice to investigate and prosecute his political enemies. For example, speaking to press from the Oval Office on July 22, 2025, President Trump posited: "After what they did to me and whether it's right or wrong, it's time to go after people." Eli Stokols, *Deflecting Epstein questions, Trump urges DOJ to 'go after' Obama*, Politico (July 22, 2025 at 13:13 ET), https://www.politico.com/news/2025/07/22/trump-epstein-urges-doj-obama-00467514.    And on September 20, 2025, President Trump posted a message on Truth Social directed to "Pam," presumably referring to Attorney General Pam Bondi: "Nothing is being done. What about Comey, Adam 'Shifty' Schiff, Leticia??? They're all guilty as hell, but nothing is going to be done. . . . We can't delay any longer, it's killing our reputation and credibility. They impeached me twice, and indicted me (5 times!), OVER NOTHING. JUSTICE MUST BE SERVED, NOW!!!" Donald J. Trump (@realDonaldTrump), Truth Social (Sep. 20, 2025, at 18:44 ET), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727. That same month, when Erik Siebert, then the interim U.S. Attorney for the Eastern District of Virginia, concluded that the law and facts did not support an indictment of James Comey, the President told reporters in the Oval Office that he wanted Siebert "out." *United States v. Comey*, ___ F. Supp. 3d ___, 2025 WL 3266932, at *2 (E.D. Va. Nov. 24, 2025). Siebert resigned that day, and his successor promptly sought an indictment against Comey. *Id.* at *2–3. And on October 10, 2025, at a press conference with FBI Director Kash Patel, President Trump stated, "I hope they're looking at political crime because there's never been so much political crime against a political opponent as what I had to go through." The White House, President Trump Participates in a Press Conference with the

Director of the FBI (Oct. 15, 2025), https://www.whitehouse.gov/videos/president-trump-participates-in-a-press-conference-with-the-director-of-the-fbi/.

On January 8, 2026, at a gathering of United States Attorneys at the White House, the President "blasted" them, calling them "weak" and "complaining they weren't moving fast enough to prosecute his favored targets." Sadie Gurman, C. Ryan Barber & Josh Dawsey, *Trump Blasted Federal Prosecutors at White House Event, Calling Them Weak*, Wall St. J. (Jan. 13, 2026, at 17:46    ET),    https://www.wsj.com/politics/policy/trump-blasted-federal-prosecutors-at-white-house-event-calling-them-weak-c185412b. On January 9, 2026—the next day—the USAO delivered the two Subpoenas to the Board. *See* Ex. A and Ex. B to Declaration of Leah B. Grossi (copies of the Subpoenas).

The first subpoena, ▮▮▮▮▮▮▮▮▮▮▮▮ requests materials regarding Chair Powell's testimony before the Senate Banking Committee (the "Committee") on June 25, 2025, and specifically, his testimony concerning the Federal Reserve's ongoing renovation projects. That hearing lasted two and a half hours and, as prescribed by the Federal Reserve Act, focused on "the conduct of monetary policy" and "economic developments and prospects for the future." 12 U.S.C. § 225b(a)(1). Chair Powell spoke about the renovations for less than two minutes. *See The Semiannual Monetary Policy Report to the Congress Before the S. Comm. on Banking, Hous., and Urban Affs.*, 119th Cong. (2025). He began to answer a question from Senator Rounds about the renovations but was cut off by Committee Chairman Scott because Senator Rounds's time was up. *See id.* Chair Powell later attempted to correct Senator Scott's statements about the renovation project but again was cut off. *See id.* That abbreviated answer occupied no more than half a minute. *See id.* Given the interruptions, Senator Scott suggested that the Chair's staff and his own staff meet after the hearing to discuss the details of the project ("I would welcome your staff

coming in to walk my staff through what is happening there")—a suggestion that Chair Powell embraced and made good on. *See id.* Chair Powell also committed to responding to the questions in writing, which he then did.

In advance of the meeting of the staffs, Chair Powell wrote Senators Scott and Warren to expand upon some of the topics addressed in his truncated and interrupted testimony, providing additional information about the renovation project, including reference to the Board website's Frequently Asked Questions about the project. *See* Ex. C to Declaration of Leah B. Grossi. The Federal Reserve and Committee staffs met on July 17. On August 12, the Federal Reserve produced nearly 600 documents for the Committee staff's review. In the five months since, the Committee has not requested any further information, and neither the Committee nor any Committee Member has publicly made a criminal referral to the Department of Justice.[4]

The second subpoena, #███████████ requests materials related to the renovations about which Chair Powell testified. It seeks, for example, ███████████████

████████████████████████████████████████████

---

[4]    Representative Anna Paulina Luna issued a press release on July 19, 2025, announcing that she had made a criminal referral. Press Release, Congresswoman Anna Paulina Luna, Rep. Anna Paulina Luna Refers Federal Reserve Chair Jerome Powell for Criminal Investigation Over False Testimony (July 21, 2025), https://luna.house.gov/posts/rep-anna-paulina-luna-refers-federal-reserve-chair-jerome-powell-for-criminal-investigation-over-false-testimony.    Representative Luna is not a member of the Senate Banking Committee, nor its counterpart in the House, nor was she present for any of Chair Powell's testimony. She has, however, made at least six other criminal referrals of four mayors, one governor, and one state attorney general. Julia Manchester, *GOP lawmaker says she will criminally refer 4 Democratic mayors to DOJ*, The Hill (Mar. 5, 2025, at 14:37 ET), https://thehill.com/homenews/house/5178359-luna-criminal-referral-sanctuary-cities/; David Zimmermann, *Luna refers Walz and Ellison to DOJ for criminal prosecution over Minnesota fraud*, Wash. Examiner (Jan. 8, 2026, at 16:13 ET), https://www.washingtonexaminer.com/news/justice/4411722/anna-paulina-luna-tim-walz-keith-ellison-doj-prosecution-minnesota-fraud/.

While there are significant costs associated with the renovation of historic buildings (especially those that have had no comprehensive renovation since they were constructed nearly 100 years ago), the Board is working diligently to manage them. The Board's Office of Inspector General conducted an audit into the renovations in 2022 and did not bring any concerns about potential criminal conduct to the Board's attention.

### D.    Current and Former Government Officials Condemn the USAO's Issuance of Subpoenas to Influence Monetary Policy.

When word of the Subpoenas became public, current and former government officials from across the political spectrum recognized that the Subpoenas were intended to attack the independence of the Federal Reserve, to pressure it to conform monetary policy to the President's preferences, and, in pursuit of that same goal, to harass Chair Powell into resignation. Alan Greenspan, Ben Bernanke, Janet Yellen, and 11 former Treasury secretaries and top economic officials from Democratic and Republican administrations alike called it "an unprecedented attempt to use prosecutorial attacks to undermine" the independence of the Federal Reserve. Ben S. Bernanke et al., *Statement on the Federal Reserve* (Jan. 12, 2026), https://jointstatement.substack.com/p/statement-on-the-federal-reserve. Senator Murkowski referred to the investigation as nothing more than an attempt at coercion. Senator Lisa Murkowski (@lisamurkowski), X (Jan. 12, 2026, at 11:00 ET), https://x.com/lisamurkowski/status/2010743755603948017. For Senator Tillis, "[i]f there were any remaining doubt whether advisors with the Trump administration are actively pushing to end the independence of the Federal Reserve, there should now be none." Senator Thom Tillis (@SenThomTillis), X (Jan. 11, 2026, at 19:50 ET),

https://x.com/SenThomTillis/status/2010514786467959269. The *Wall Street Journal* called the Subpoenas "lawfare." *Lawfare for Dummies, Monetary Edition*, Wall St. J. (Jan. 12, 2026, at 17:47 ET), https://www.wsj.com/opinion/jerome-powell-subpoena-federal-reserve-department-of-justice-donald-trump-bill-pulte-jeanine-pirro-b6913599.

While denying involvement in the Subpoenas, the President said "[t]hat jerk"—referring to Chair Powell—"will be gone soon." Kevin Breuninger, *Trump attacks Powell again amid Fed independence fears: 'That jerk will be gone soon,'* CNBC (Jan. 14, 2026, at 07:49 ET), https://www.cnbc.com/2026/01/13/trump-powell-fed-dimon-pirro-doj.html. On January 21, the President declared that if Chair Powell refuses to abandon his position as a Governor on the Federal Reserve after his tenure as Chair ends in May, "his life won't be very very happy." Kevin Breuninger, Spencer Kimball & Alex Harring, *Trump interview: President tells CNBC 'We have a concept of a deal' over Greenland*, CNBC (Jan. 22, 2026, at 03:00 ET), https://www.cnbc.com/2026/01/21/trump-interview-live-updates.html.

**ARGUMENT**

It is clear that the USAO's dominant, if not sole, purpose in issuing the Subpoenas is to help the President dictate monetary policy, contrary to Congress's clear legislation, through harassment of the Federal Reserve and Chair Powell, including pressuring Chair Powell to resign. That purpose is improper as a matter of law, so the Court should quash the Subpoenas.

## I.    A SUBPOENA MUST BE QUASHED WHERE ITS "DOMINANT PURPOSE" IS IMPROPER.

Federal Rule of Criminal Procedure 17(c) provides that "the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." That text can only take the Court so far, though, because "what is reasonable depends on the context." *R. Enters.*, 498 U.S. at 299. Courts, including the Supreme Court, have thus imposed some metes and bounds as to

14

reasonableness in the grand jury context, adopting standards that give "due weight to the difficult position of subpoena recipients but do[] not impair the strong governmental interests in affording grand juries wide latitude, avoiding minitrials on peripheral matters, and preserving a necessary level of secrecy." *Id.* at 300. And courts no doubt afford grand juries broad discretion: "A grand jury subpoena issued through normal channels is presumed to be reasonable" and when "a subpoena is challenged on relevancy grounds, the motion to quash must be denied unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *Id.* at 301.

But there are checks to prevent abuses of this potent prosecutorial authority. The grand jury's subpoena power is "not unlimited and [is] subject to the supervision of a judge." *Branzburg v. Hayes,* 408 U.S. 665, 688 (1972). The court's supervisory role "is especially important because of the risks for abuse that inhere in proceedings over which trial and appellate courts rarely have insight." *United States v. Calk,* 87 F.4th 164, 186 (2d Cir. 2023). While the subpoena power formally belongs to the grand jury, "in modern federal practice, prosecutors often issue grand jury subpoenas with little or no involvement of the grand jurors themselves." *In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.,* 2026 WL 60793, at *10 (N.D.N.Y. Jan. 8, 2026); *see also* Grand Jury Law and Practice § 6:2 (2d ed.) ("Despite the fact that federal prosecutors have no independent subpoena authority, the federal courts have universally rejected the claim that the prosecutor must secure the prior authorization of the grand jury before he can issue a subpoena."). "Rule 17 therefore functions as a key mechanism to ensure that the grand jury is not 'misused' by the Department of Justice." *In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.,* 2026 WL 60793, at *10 (citation omitted).

15

As the Supreme Court has stated, one prohibited form of grand jury abuse is "select[ing] targets of investigation out of malice or an intent to harass." *R. Enters.*, 498 U.S. at 299. Indeed, courts have long recognized that a subpoena "posed in bad faith for the purpose of harassing" recipients or other individuals is an "abuse of the grand jury process [that] cannot be tolerated in a free society." *Ealy v. Littlejohn*, 569 F.2d 219, 230 (5th Cir. 1978). "It is in this realm—in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies." Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3, 5 (1940). The use of a grand jury subpoena for such purposes is (fortunately) exceedingly rare, leaving little precedent expounding on this limit.

Nonetheless, where a prosecutor uses the grand jury subpoena power for an improper purpose, this Court and others have applied a "dominant purpose" test. Under that test, a court should find that "the government abused the grand jury system" if it "us[es] the grand jury" for a "'primary purpose'" that is improper. *United States v. Sitzmann*, 74 F. Supp. 3d 96, 123 (D.D.C. 2014). Framed differently, a subpoena should be quashed "when the illegitimate purpose is the 'sole or dominant purpose of seeking the evidence.'" *In re Grand Jury Subpoena*, 175 F.3d 332, 340 (4th Cir. 1999); *see also, e.g., In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985); *In re Grand Jury 95-1*, 59 F. Supp. 2d 1, 15–16 (D.D.C. 1996); *In re Grand Jury Subpoenas to Off. of New York State Att'y Gen.*, 2026 WL 60793, at *10. This question arises most often when an indicted defendant contends that the prosecutor misused a grand jury subpoena to obtain evidence for trial—thus evading the proper procedure to gather evidence for trial on an already-indicted charge, namely, a trial subpoena. *See, e.g., In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d at 29–30. Case law is clear

16

that a grand jury subpoena should be quashed if its primary purpose is to "strengthen[] the Government's case on a pending indictment or as a substitute for discovery." *Sitzmann*, 74 F. Supp. 3d at 123.

The inquiry into purpose goes to the threshold issue of whether the grand jury is operating within its lawful authority, where it enjoys a presumption of "regularity," *R. Enters.*, 498 U.S. at 300–01. As the Second Circuit has explained, determining the dominant purpose of a subpoena "is not the typical question of historical fact . . . . It is the application of a legal standard designed to ensure that the grand jury, a body operating peculiarly under court supervision, . . . is not misused." *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d at 29. Even absent a showing that a subpoena was motivated by an improper purpose, a subpoena recipient can challenge a subpoena's relevance—assessing whether the subpoena offers a "reasonable possibility" of securing evidence relevant to an appropriate exercise of the grand jury's investigatory authority. *R. Enters.*, 498 U.S. at 301–02. But where the dominant purpose falls outside a prosecutor's lawful authority, the fact that the subpoena might unearth something relevant to a topic of interest to the prosecutor—but outside her lawful authority—does not permit enforcement of the subpoena. *See In re Grand Jury Subpoena*, 175 F.3d at 339–40 (quashing subpoena where dominant purpose was to aid in parallel civil case); *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d at 29 (quashing subpoena where dominant purpose was to secure evidence relevance to ongoing trial).

Analogously, albeit under a somewhat different standard, a string of recent decisions have quashed administrative subpoenas found to be issued for a purpose outside the scope of the federal government's authority—namely, to end gender-affirming care despite the States' primacy in the field of the practice of medicine. *See, e.g., In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp.

3d 229, 237–39 (D. Mass. 2025), *appeal docketed*, No. 26-1093 (1st Cir. Jan. 30, 2026); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 2025 WL 3013568, at \*5–7 (W.D. Wash. Oct. 27, 2025), *appeal docketed*, No. 25-7384 (9th Cir. Nov. 24, 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at \*10–12 (W.D. Wash. Sept. 3, 2025). There, as here, the government cannot use its subpoena powers to "do indirectly what [it] is barred from doing directly." *Cf. Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

As noted, most reported applications of the "dominant purpose" test have involved allegations of improper government attempts to seek evidence via a grand jury for use in another proceeding, such as a pending criminal trial or a civil suit. But there is no reason the test should be limited solely to that context: An improper purpose is an improper purpose. It would make no sense to conclude that a grand jury subpoena should be quashed when the dominant purpose is improper because it seeks evidence for a pending criminal trial but a subpoena should *not* be quashed when the dominant purpose is improper because it seeks to coerce the Federal Reserve in its exercise of statutorily independent conduct of monetary policy. Gathering evidence for a pending trial is within the government's legitimate authority; the government's offense in that context is merely that it is using a more convenient or advantageous procedure rather than the applicable procedure. Dictating monetary policy, in contrast, is outside the President's and the USAO's lawful authority altogether. And the point of the dominant purpose test—and more broadly of courts' oversight of the grand jury process—is to ensure the subpoena power "is not misused," *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d at 29, or "abused," *Sitzmann*, 74 F. Supp. 3d at 123.

Here the USAO's improper purpose is particularly pernicious given that Congress afforded the Federal Reserve independence in the setting of monetary policy precisely to insulate it from

18

political pressure. That statutorily secured independence over monetary policy is critical to economic stability and has roots dating back to the First Bank of the United States, established in 1791. *See Wilcox*, 145 S. Ct. at 1415. Just recently, before the Supreme Court, the government did not dispute the Federal Reserve's independence, recognizing the "long tradition of having this exercise of monetary policy be exercised independent of . . . executive influence." Oral Arg. Tr. at 48:5–11, *Trump v. Cook*, No. 25A312 (U.S. Jan. 21, 2026). During that same oral argument, Justice Kavanaugh expressed concern that if the courts could not review and meaningfully check the President's purportedly "for cause" removals of Governors of the Board, the independence entrusted by Congress to the Federal Reserve could be "weaken[ed], if not shatter[ed.]" *Id.* at 49:1–6. The same is true of abuse of criminal process. While the President is free to criticize the Federal Reserve, if the President announces his preferred monetary policy and then his prosecutors are permitted to unleash criminal investigations until the President's preference is obeyed, the independence of the Federal Reserve would be shattered.

Finally, the Court should reject any suggestion that a criminal investigation is harmless in the absence of an indictment. The myriad burdens of responding to criminal process and grappling with potentially disastrous outcomes are weighty. As President Trump noted in arguing that he should be immune from a grand jury subpoena during his first term, "like the fact of indictment itself," a grand jury subpoena "will inevitably distract, burden, and stigmatize" the target. Br. for Petitioner at 29–30, *Trump v. Vance*, 591 U.S. 786 (2020) (No. 19-635) (quoting *A Sitting President's Amenability to Indictment and Criminal Prosecution,* 24 U.S. Op. Off. Legal Counsel 222, 249-51 (Oct. 16, 2000)); *see also* Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology at 3 ("The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous. He can have citizens investigated and, if he is

that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimations."); *cf.* Br. of the United States as Amicus Curiae, at 14–15, *First Choice Women's Resource Ctrs., Inc. v. Platkin,* U.S. No. 24-781 (arguing that state attorney general "caused petitioner's imminent injury by issuing and threatening to enforce [a] subpoena").

In sum, this Court should quash the Subpoenas if their sole or dominant purpose is the improper goal of pressuring, harassing, and punishing the Federal Reserve and its Chair so that the President can dictate monetary policy. For the reasons below, that test is met here.

## II.    THE DOMINANT PURPOSE OF THE SUBPOENAS IS IMPROPER HARASSMENT TO PRESSURE THE FEDERAL RESERVE TO LOWER INTEREST RATES.

The public record demonstrates that the dominant purpose of the Subpoenas is improper.[5] The dominant, if not exclusive, purpose of the Subpoenas is to retaliate against and harass the Federal Reserve and Chair Powell for fulfilling their statutory duty to set monetary policy independent of political currents and to pressure the FOMC into acceding to the President's desired policies. The President articulated his goal—to dictate monetary policy and lower interest rates. He directed the Department of Justice to go after his enemies. And the USAO obliged.

*First,* President Trump has repeatedly articulated his desire to dictate monetary policy and attacked the Federal Reserve and Chair Powell for failing to set interest rates at his preferred level. *See* Jeanna Smialek, *Trump Suggests That President Should Have a 'Say' in Interest Rates,* N.Y. Times (Aug. 8, 2024), https://www.nytimes.com/2024/08/08/business/economy/trump-fed-

---

[5] While the improper dominant purpose of the Subpoenas is evident from the public record, it would be within the Court's authority to conduct a hearing to gather evidence bearing on the genesis of the Subpoenas and their relation to the improper purpose of attempting to influence the Board's monetary policy. *See In re Grand Jury Subpoena,* 175 F.3d at 335, 339-40 & nn.9 & 11 (affirming district court's order quashing subpoena, including district court's decision not to credit government attorneys' affidavits attesting to the subpoena's allegedly proper purpose).

interest-rates.html ("I have a better instinct than, in many cases, people that would be on the Federal Reserve, or the Chairman."); Louis Nelson, *Trump: 'I'm the king of debt,'* Politico (June 22, 2016, at 08:09 ET), https://www.politico.com/story/2016/06/trump-king-of-debt-224642 ("I'm the king of debt. I'm great with debt. Nobody knows debt better than me."). As detailed *supra*, the pressure campaign began in President Trump's first term with insults, including statements that the Federal Reserve is "going loco," Wilkie & Rosenfeld, *supra*; is "clueless," Donald J. Trump (@realDonaldTrump), X (Aug. 14, 2019, at 15:21 ET), https://x.com/realdonaldtrump/status/1161719409804808193; and has a "horrendous lack of vision," Donald J. Trump (@realDonaldTrump), X (Aug. 19, 2019, at 11:26 ET), https://x.com/realdonaldtrump/status/1163472272612626433. He complained that "the Fed did NOTHING!" with respect to interest rates, and that Chair Powell may be a "bigger enemy" than China's Chairman Xi. Donald J. Trump (@realDonaldTrump), X (Aug. 23, 2019, at 10:57 ET), https://x.com/realDonaldTrump/status/1164914609180033026; Donald J. Trump (@realDonaldTrump), X (Aug. 23, 2019, at 10:57 ET), https://x.com/realdonaldtrump/status/1164914610836783104. In the final year of his first term, President Trump asserted that he had the "right to remove" Chair Powell. Cox, *supra*.

In his second term, the President has resumed his demands that the Federal Reserve lower interest rates, stating that he "may have to force something" to get the Federal Reserve to do so. Gangitano, *supra*. And he targeted Governors who have cast votes inconsistent with his policy demands. Not only did the President boast of calling Chair Powell "every name in the book trying to get him to do something," Smith & Romm, *supra*, he also asserted that "Powell's termination cannot come fast enough," Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 17, 2025, at 06:12 ET), https://truthsocial.com/@realDonaldTrump/posts/114352766082542122, and waved

21

a copy of a draft letter firing Powell in front of members of Congress, Haberman & Smith, *supra*. For Governor Lisa Cook, it went beyond threats: President Trump purported to remove her from office, though this effort was blocked when a court issued a preliminary injunction to preserve the Federal Reserve's statutory independence. *See Cook*, __ F. Supp. 3d __, 2025 WL 2607761, at *4–12.

On December 10, 2025, the FOMC voted to lower interest rates by 25 basis points. The President complained that the rate cut should have been "doubled," and he called Chair Powell "a stiff." Breuninger, *Trump Says Fed Could Have 'At Least Doubled' Latest Interest Rate Cut*, *supra*. And just days after the Subpoenas were issued, President Trump called Chair Powell a "jerk" and proclaimed he would "be gone soon," Breuninger, Kimball & Harring, *supra*, while declaring, "[a]nybody that disagrees with me will never be the Fed Chairman!" Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 23, 2025, at 12:55 ET), https://truthsocial.com/@realDonaldTrump/posts/115770165868454573. And while Chair Powell's term as Chair ends this coming May, his tenure as a Governor extends through January 2028. President Trump has made clear that he does not want Chair Powell to serve out that tenure as Governor—warning that "his life won't be very very happy" if he does so. Breuninger, Kimball & Harring, *supra*. If Powell resigns early, the President can replace him with a Governor more malleable to the President's will, allowing the President to dictate monetary policy at the expense of the Federal Reserve's statutorily secured independence.

*Second,* President Trump has repeatedly demanded that the Department of Justice use criminal process to punish his enemies. For example, in September 2025, the President voiced his frustration with his hand-picked prosecutors' lack of results, posting on Truth Social: "Nothing is being done. What about Comey, Adam 'Shifty' Schiff, Leticia??? They're all guilty as hell, but

22

nothing is going to be done. ... We can't delay any longer, it's killing our reputation and credibility." Donald J. Trump (@realDonaldTrump), Truth Social (Sep. 20, 2025, at 18:44 ET), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727. On January 8, 2026, the President addressed the entire cadre of United States Attorneys at the White House, reportedly "[b]last[ing]" them for not "moving fast enough to prosecute his favored targets," and calling them "weak" and "ineffective." Gurman, Barber & Dawsey, *supra*. The U.S. Attorney for the District of Columbia was present, *id.*, and her office issued the Subpoenas to the Board the very next day. Courts have recognized that the timing of subpoenas "may . . . shed light on an improper purpose." *Trump v. Vance*, 480 F. Supp. 3d 460, 483 (S.D.N.Y. 2020) (internal quotation marks and citations omitted); *see also In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d at 29 ("The timing of the subpoena casts significant light on its purposes.").

As multiple current and former government officials rightly and immediately recognized, *see supra*, the USAO delivered the Subpoenas to harass, punish, and threaten the President's enemies to help him to dictate the conduct of monetary policy. The message is clear: Any member of the FOMC who does not vote as the President desires may be next. And the notion that the USAO instead issued the Subpoenas for the "dominant purpose" of investigating criminal conduct in connection with Chair Powell's testimony about the renovations, or the renovations themselves, is not credible. Chair Powell's testimony on the renovations lasted less than two minutes, was twice interrupted, and was supplemented by letter and subsequent communications between the Federal Reserve and congressional staffs.[6] Nor is it plausible that the USAO's dominant purpose is to investigate criminality in the renovations themselves. Renovations of historic buildings often

---

[6] While Congress granted the Federal Reserve broad authority over the construction and management of its buildings, *see* 12 U.S.C. § 243, the Board does not dispute that Congress retains oversight authority regarding the renovation projects.

come with extensive costs and hurdles. The Office of Inspector General audited the work in 2022, did not raise any concerns about any potential criminality following its audit, and the Inspector General is presently conducting another review. Such an investigation is not the dominant purpose of the USAO's Subpoenas. Rather, the President's aggressive demands that the Federal Reserve implement his desired monetary policy, coupled with his direction to prosecutors to target his enemies, leave no doubt about what is really going on here. Even where the Court's review of executive action is "deferential," the Court is "'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. N.Y.*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)); *see also United States v. Zubaydah*, 595 U.S. 195, 237 (2022) (Gorsuch, J., dissenting) ("There comes a point where we should not be ignorant as judges of what we know to be true as citizens." (citing *Watts v. State of Ind.*, 338 U.S. 49, 52 (1949)).

* * *

While it is important that grand juries be afforded substantial leeway in the investigation of potential crimes, it is equally important that the powers of the grand jury not be abused by prosecutors to accomplish improper goals. Courts have adopted the "dominant purpose" test to protect against such abuse while affording grand juries adequate leeway, and here that test's high standards are met. The President has made clear that he wants to dictate monetary policy and lower interest rates. He has made clear that he is unhappy with Chair Powell and other members of the FOMC for failing to set monetary policy consistent with his preferences. He is actively trying to terminate one member of the Board, and he has threatened to terminate Chair Powell. He publicly labeled Chair Powell an enemy and directed the Department of Justice to pursue his enemies. Thus, the USAO issued the Subpoenas for the dominant, if not sole, purpose of harassing,

24

pressuring, and punishing the Federal Reserve and Chair Powell until they allow the President to

dictate monetary policy—a power expressly and intentionally withheld from him by Congress.

The Subpoenas therefore must be quashed.

## CONCLUSION

For these reasons, the Board respectfully requests that this Court quash the Subpoenas.

Dated: Washington, D.C.
February 3, 2026

Respectfully submitted,

Jeffrey S. Bucholtz (Bar ID 452385)
JBucholtz@kslaw.com
Robert K. Hur (*pro hac vice* pending)
RHur@kslaw.com
Leah B. Grossi (Bar ID 1024022)
LGrossi@kslaw.com
Nicholas A. Mecsas-Faxon (Bar ID 1779269)
NMecsas-Faxon@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

Andrew Z. Michaelson (*pro hac vice*
forthcoming)
AMichaelson@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Attorneys for the Board of Governors of the
Federal Reserve System*

25

## CERTIFICATE OF SERVICE

I hereby certify that, on February 3, 2026, I caused the foregoing Memorandum in Support of the Board of Governors of the Federal Reserve System's Motion to Quash Subpoenas, and exhibits thereto, to be filed in person with the Clerk for the U.S. District Court for the District of Columbia. I further certify that I caused the same to be served via U.S. Postal Service First Class Mail on the following members of the United States Attorney's Office for the District of Columbia:

Judge Jeanine Ferris Pirro, United States Attorney for the District of Columbia
Carlton J. Davis, Special Counsel
Steven Vandervelden, Special Counsel
Patrick Henry Building
601 D Street NW
Washington, D.C. 20530

Leah B. Grossi

26

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*In re* Grand Jury Subpoenas Nos. ████████ and ████████

Case No. 1:26-mc-00012-JEB

**FILED UNDER SEAL**

## DECLARATION OF LEAH B. GROSSI IN SUPPORT OF MOTION TO QUASH SUBPOENAS

I, Leah B. Grossi, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.

2. The evidence set out in this Declaration is based on my personal knowledge.

3. Attached as **Exhibit A** is a true and correct copy of Subpoena No. ████████ dated January 9, 2026.

4. Attached as **Exhibit B** is a true and correct copy of Subpoena No ████████ dated January 9, 2026.

5. Attached as **Exhibit C** is a true and correct copy of a letter from Chair Jerome Powell to Senators Tim Scott and Elizabeth Warren, dated July 14, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 3, 2026.

_Leah B. Grossi_

Leah B. Grossi

# EXHIBIT A
# REDACTED

# EXHIBIT B

# REDACTED

# EXHIBIT C



BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D. C. 20551

JEROME H. POWELL
CHAIR

July 14, 2025

The Honorable Tim Scott
Chairman
Committee on Banking, Housing,
   and Urban Affairs
United States Senate
Washington, D.C.  20510

The Honorable Elizabeth Warren
Ranking Member
Committee on Banking, Housing,
   and Urban Affairs
United States Senate
Washington, D.C.  20510

Dear Chairman Scott and Ranking Member Warren:

I am writing to follow up on your interest in the Federal Reserve Board's (Board) Marriner S. Eccles Building (Eccles Building) and 1951 Constitution Avenue Building project. The Board believes it is of the utmost importance to provide transparency for our decisions and to be accountable to the public through the Congress for our work.  We take seriously our commitment to transparency.  We respect the critical importance of the constitutionally-derived congressional oversight of our activities, and we are committed to working collaboratively and cooperatively with you.

In advance of Board staff discussing the project in further detail with your staff as you have requested, I wanted to share a set of frequently asked questions (FAQs) about the project and provide you with additional information.  The FAQs address the project goals, engagement with state and federal entities, cost drivers, and various features of the project.  The FAQs are enclosed and are also on our public website.[1]

For historical perspective, the Eccles Building was constructed between 1935 and 1937 as the headquarters for the Federal Reserve Board.  The 1951 Constitution Avenue Building was constructed in 1932 for the U.S. Public Health Service.  Over its history, it housed a variety of

---

[1] See https://www.federalreserve.gov/faqs/building-project-faqs.htm.

- 2 -

government agencies, including the Combined Chiefs of Staff during World War II, the Atomic Energy Commission, the National Science Foundation, and the Department of the Interior. Both buildings are listed in the District of Columbia Inventory of Historic Sites, and the 1951 Constitution Avenue Building is listed on the National Register of Historic Places.

While periodic work has been done to keep the buildings occupiable, neither building has seen a comprehensive renovation since they were constructed. For some time, significant structural repairs and other updates were needed for the Eccles Building. Similarly, the vacant and dilapidated 1951 Constitution Avenue Building, across the street from the Eccles Building, needed significant repairs and updating.

Despite its condition, the 1951 Constitution Avenue Building provided an opportunity for the Board to consolidate its operations and reduce expenses over time on leased space in commercial office buildings elsewhere. In 2017, the General Services Administration (GSA) approached us about our interest in taking over the 1951 Constitution Avenue Building. In 2018, GSA transferred sole control of the 1951 Constitution Avenue Building to the Board. In a press release announcing the transfer in 2018, GSA's Public Buildings Service Commissioner stated "This transfer will put a vacant building back in productive use, allow the Federal Reserve Board to consolidate several leases and result in savings for taxpayers."[2]

To address the significant state of disrepair and unsafe working conditions, the Board is undertaking a complete overhaul and modernization of these two historic buildings. This includes remediation and updates to make the buildings safe, healthy, and effective places to work by removing asbestos and lead contamination and accommodating modern workplace technology. The project has also involved the complete replacement of antiquated systems that are beyond their useful life, such as electrical; plumbing; heating, ventilation, and air conditioning; and fire detection and suppression systems. As part of the project, the Board has undertaken major structural work to bring the buildings up to modern code, including current accessibility, security, and safety standards.

Throughout the process, the Board chose to consult with a range of state and federal agencies including the Commission on Fine Arts, the District of Columbia's Public Space Committee and its State Historic Preservation Office, the National Park Service, and the National Capital Planning Commission (NCPC). As discussed in the enclosed FAQs, although the Board is generally not subject to the jurisdiction of the NCPC, historically the Board has submitted building project designs to the NCPC and worked with the NCPC to address their feedback.

In recognition of the historic nature of both buildings and their prominent location on the National Mall, the project identified key architectural features to preserve the historic integrity of the buildings, such as stonework, including marble, façades, meeting rooms, and other spaces. Historic preservation work in the Eccles Building also includes elevators that are original to the building, and historic conference rooms. Construction involving the preservation of historic

---

[2] *See* https://www.gsa.gov/about-us/newsroom/news-releases/gsa-transfers-federal-property-to-the-federal-reserve-board-07022018#:~:text=Washington%2C%20D.C.%20%2D%20Today%2C%20the,result%20in%20savings%20for%20taxpayers.%E2%80%9D.

- 3 -

spaces requires specialized processes and methods, which are generally more complex and have increased costs compared with new construction or renovation of spaces that are not historically significant or located on the National Mall.

Various factors drove cost increases following the NCPC's final approval of site and building plans in 2021. These factors include differences over time between original estimates and actual costs of materials, equipment, and labor, and unforeseen conditions in the properties, such as more asbestos than anticipated, toxic contamination in the soil, and a higher-than-expected water table.

As is to be expected in the major renovation of nearly 100-year-old historic buildings, the Board's designs have continued to evolve over the course of the project, and some features of the buildings, including rooftop spaces and new water features on the building grounds, were scaled back or eliminated as the project moved forward. These changes simplified the project and reduced the likelihood of further delays and cost overruns. None of them added cost to the project. We do not consider these changes to be substantial.

With respect to the specific concerns that were discussed at the hearing, I would like to provide additional detail regarding various elements of the project:

- The Eccles and 1951 Constitution Avenue buildings were originally built with marble in the façades and stonework. The project has salvaged the original exterior marble to be reinstalled and will use new domestic marble sourced from Georgia in places where the original was damaged or where needed to keep with historic preservation guidelines and to address concerns raised by external review agencies.
- The original elevators are being rehabilitated, including an elevator that services historic conference rooms. A short (eighteen inch) extension of this rehabilitated elevator will make the space more accessible for people with disabilities. There are no elevators where access is limited to governors. There are no VIP dining rooms being constructed as part of the project. The Eccles Building has historic multi-use rooms that are used as conference rooms and for mealtime meetings, which are being renovated and preserved.
- Although the Board's initial design included new water features for 1951 Constitution Avenue, they have been eliminated. Fountains that were original to the Eccles Building are being restored.
- The ground-level front lawn of 1951 Constitution Avenue serves as the roof of the parking structure beneath. It was referred to as a "garden terrace" in the 2021 submission to the National Capital Planning Commission. There are other references to "vegetated roofs," often referred to as green roofs, which are commonly used to help with stormwater management and to increase building efficiency and roof longevity. Green roofs are found on other federal government buildings, like the Departments of Justice, Interior, and many others, and are encouraged by the General Services Administration.[3]

We take seriously the responsibility to be good stewards of public resources as we fulfill the duties given to us by Congress on behalf of the American people. We have taken great care

---

[3] https://www.gsa.gov/governmentwide-initiatives/federal-highperformance-buildings/resource-library/integrative-strategies/green-roofs/green-roof-tracker.

- 4 -

to ensure the project is carefully overseen since it was first approved by the Board in 2017. The project has been subject to annual budget approval by the Board since then. In addition to oversight by members of the Board, our independent Inspector General (IG) has had full access to project information on costs, contracts, schedules, and expenditures and receives monthly reports on the construction program. The Board's IG conducted an audit in 2021 to assess the Board's process for planning and managing multiple renovation projects as well as procuring services under various renovation-related contracts. I have asked the Board's IG to take a fresh look at the project.

I hope you find this additional information helpful.

Sincerely,

Jerome H. Powell