UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: GRAND JURY INVESTIGATION | : | UNDER SEAL |
| | : | |
| | : | Grand Jury No.: 26-mc-12 (JEB) |
| | : | |
| | : | |
| | : | |

## GOVERNMENT'S OPPOSITION TO MOTION TO QUASH SUBPOENAS

The United States, hereby, opposes the Board of Governors of the Federal Reserve System's (the Board) Motion to Quash Subpoenas (Mot.).

### I.    Introduction

As part of an investigation into possible fraud and false statements related to the renovation of a government facility, two grand jury subpoenas (the "Subpoenas" (attached as Exs. A and B)) were issued to the Board.  The Board claims the Subpoenas were issued for an improper purpose and asks the Court to quash them.  In support of its claim, the Board provides a prolix recitation of social media posts and other comments.  While the majority of these posts and comments preceded the Subpoenas by months, if not years, the Board does not present even a scintilla of evidence they had any effect on the issuance of the Subpoenas.  The Board's argument suffers from the logical fallacy of *post hoc ergo propter hoc*.  Since the Board has failed to establish that the Subpoenas were issued for an improper purpose, its motion should be denied.

### II.    Background

The Board is in the process of renovating its facility, specifically the Marriner S. Eccles and 1951 Constitution Avenue buildings.  The renovation has involved substantial cost overruns. These overruns have been the subject of congressional oversight, including testimony on June 25,

2025, from the Chair of the Federal Reserve, Jerome H. Powell, whose testimony contained possible discrepancies.[1]

In November 2025, the U.S. Attorney's Office for the District of Columbia (USAO) began an investigation to determine whether the renovation's overruns were indicative of fraud, *cf.* Mot. at 13 (four-year-old OIG audit did not obviate need to investigate), and whether Chair Powell's congressional testimony contained false statements. The USAO contacted the Board in December 2025, in a collaborative manner, in an effort to obtain relevant evidence. Specifically, the USAO contacted the Board by emails on December 19, 2025 and then again on December 29, 2025. In both emails the USAO indicated a request to meet in the first week of January 2026, and in both emails the USAO offered to provide additional details and context on a phone call to ensure a meeting would be productive. The Board never replied to either email, refusing to cooperate or respond to the USAO's overture.

On ███████████ a grand jury investigation of potential fraud with respect to the Board's renovations, involving possible violations of ████████████████████████████ ████████████████████ was opened. The Subpoenas were issued to the Board on ████████████████████ on Sunday, January 11, 2026, Chair Powell publicly announced the Board had received the Subpoenas.[2] The Subpoenas were returnable on ████████████ but, to date, the Board has not complied.

---

[1]    The Board mentions that, after Chair Powell's testimony, members of its staff met with congressional staffers to further discuss the renovations. (Mot. at 12) Even if the matter was resolved one of the grand jury's "mission[s] is to clear the innocent . . . ." *United States v. Dionisio*, 410 U.S. 1, 16 (1973). The Board also notes that Chair Powell's possibly problematic testimony lasted less than two minutes (Mot. at 11), but ███████████████████

[2]    *See* https://www.federalreserve.gov/newsevents/speech/powell20260111a.htm.

On January 27, 2026, the Board's attorney asked to meet with United States Attorney Jeanine Pirro to discuss the Subpoenas. The requested meeting, which included Chair Powell's personal attorney, was held on January 29, 2026. At that meeting Chair Powell's attorney told the United States Attorney that: (1) the President does not have enough votes in the Senate to confirm a new Board Chair; (2) the Chair feels like the independence of the Board requires him not to be pushed out; (3) the Chair feels like he would not leave the Board when his term as Chair expires, if he was still under investigation; and (4) while he could not say the converse is true, it would be a different look to the Chair if he was not facing criminal investigation and the Chair would be free to make a decision that would focus on his family. When the meeting ended, the USAO and the Board agreed to continue to discuss the Subpoenas. However, shortly thereafter, the Board's attorney contacted the USAO to report the Board had filed the Mot.

## III.    The Subpoenas should not be quashed.

Grand juries have broad investigative powers, and their subpoenas are presumptively reasonable. The Board has not come close to carrying its burden of overcoming that presumption.

### A.    The grand jury's investigative prerogative is broad.

The grand jury has a unique role in the criminal justice system. *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991); *see also United States v. Williams*, 504 U.S. 36, 47 (1992) (citation omitted) ("the grand jury is mentioned in the Bill of Rights, but not in the body of the Constitution. It has not been textually assigned, therefore, to any of the branches described in the first three Articles. It is a constitutional fixture in its own right."). "Although the grand jury normally operates, of course, in the courthouse and under judicial auspices, its institutional relationship with the judicial branch has traditionally been, so to speak, at arm's length." *Id.* at 47; *see also United States v. Seals*, 130 F.3d 451, 457 (D.C. Cir. 1997) ("to the extent that the supervision of a federally

3

competent grand jury implicates the Article III 'judicial power of the United States,' the power is a circumscribed one and is far removed from 'the essential attributes of the judicial power' with which Article III is principally concerned.").

The grand jury is vested with broad investigative power:

> [The grand jury] is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike this Court, whose jurisdiction is predicated on a specific case or controversy, the grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. *As a necessary consequence of its investigatory function, the grand jury paints with a broad brush.* "A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'"

*R. Enters., Inc.*, 498 U.S. at 297 (emphasis added, citation omitted).

The public's right to every man's evidence "is particularly applicable to grand jury proceedings." *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972); *see also In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (same). To obtain such evidence, "the law vests the grand jury with substantial powers." *United States v. Mandujano*, 425 U.S. 564, 571 (1976). The grand jury exercises its investigative power via "the authority to compel the attendance and the testimony of witnesses." *Id.* (cleaned up). Judicial authorization is not required before the grand jury opens an investigation. *Williams*, 504 U.S. at 48. *See, e.g., Dionisio*, 410 U.S. at 15 (grand "jurors may act on tips, rumors, evidence offered by the prosecutor, or their own personal knowledge."); *Doe v. DiGenova*, 779 F.2d 74, 80 (D.C. Cir. 1985) ("The United States Attorney's Office has considerable latitude in issuing [grand jury] subpoenas. It has been held that the government is not required to make a preliminary showing of reasonableness or relevancy before issuing a subpoena.").

**B.**    **The Subpoenas are not defective and, therefore, should not be quashed.**

There are, however, some limits on the grand jury's investigatory powers. *R. Enters., Inc.*, 498 U.S. at 299. For example, a subpoena may be quashed if the dominant reason for its issuance was improper.[3] Since grand jury subpoenas are presumptively reasonable, "the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." *Id.* at 301. The government may be required to reveal to the subpoena recipient the general subject of the grand jury's investigation before requiring the challenging party to carry its burden of persuasion. *Id.* at 302. (Not only has that been done in this case, but the government even reached out to the recipient of the Subpoenas prior to their issuance in an effort to obtain information voluntarily and avoid the grand jury process altogether.) Nevertheless, the Court should exercise caution when assessing the validity of a subpoena, as any procedure that "would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *Dionisio*, 410 U.S. at 17.

The Board claims the Subpoenas were issued for an improper purpose, namely, to harass Chair Powell in an effort to affect monetary policy. (Mot. at 1) "Because of the broad scope afforded to the grand jury's investigative powers, and the presumption of regularity that attaches to actions of the grand jury, *such objections are almost universally overruled*." GRAND JURY LAW

---

[3]    *See, e.g.*, *United States v. Wadlington*, 233 F.3d 1067, 1075 (8th Cir. 2000) (subpoena may not be used to "compel prospective grand jury witnesses to attend private interviews with government agents."); *United States v. Alvarado*, 840 F.3d 184, 189-191 (4th Cir. 2016) (subpoena may not be used to obtain evidence for indicted case); *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 432 (1983) (subpoena may not be used to obtain evidence for a civil matter).

AND PRACTICE § 6:23 (2d ed.) (emphasis added).[4]  As opposed to harassment, allegations of improper purpose typically arise where the defective subpoena is clearly linked to the improper purpose, such as when a grand jury subpoena is issued to bolster an indicted case or to assist a parallel civil action. *See* n.3, *supra*.  Such a nexus is much less clear, when, as here, the purported improper purpose is harassment.  And the Board has utterly failed to carry its burden.

The record shows the Subpoenas were properly issued pursuant to the grand jury's broad investigative fiat.  The Board's renovation of its facility has run far over budget, raising the specter of fraud; and Chair Powell's congressional testimony contains possible discrepancies, raising the specter of false statements.  Accordingly, there is a legitimate basis for the ongoing grand jury investigation of the Board's renovations and of Chair Powell's congressional testimony.  The Subpoenas call for production of materials relevant to that investigation. *See, e.g.*, *In re Maury Santiago*, 533 F.2d 727, 730 (1st Cir. 1976) (emphasis added) ("While use of the grand jury for bad faith harassment of a political dissident *with no expectation that any testimony concerning the commission of a crime* would be forthcoming would constitute an abuse, that is not the situation in this case.").  Moreover, the USAO initially contacted the Board (privately) to discuss the matter.  It was only after the USAO's overtures were rebuffed repeatedly that the Subpoenas were issued, and, significantly, it was Chair Powell – not the government – who publicized the issuance of the Subpoenas.

---

[4]    *Ealy v. Littlejohn*, 569 F.2d 219 (5th Cir. 1978), is the only case cited by the Board where a court determined that a grand jury subpoena had been issued to harass and quashed the subpoena. *Ealy*, however, is inapposite: *Ealy* involved a grand jury subpoena that impinged on the recipients' First Amendment rights and for which there "was no justification." *Id.* at 228.  Likewise, the Board's citation to matters involving administrative subpoenas (Mot. at 17-18) is inapposite, as the administrative subpoena power is more circumscribed than the grand jury's. *See, e.g.*, *In re Subpoena Duces Tecum No. 25-1431-016*, No. 25-MC-00041, 2025 WL 3562151, at *5 (W.D. Wash. Sept. 3, 2025) (administrative subpoena requires "realistic expectation" of producing relevant materials; administrative subpoena cannot be issued based on "mere speculation of unlawful conduct"). *But see Dionisio*, 410 U.S. at 15 (grand "jurors may act on tips, rumors, evidence offered by the prosecutor, or their own personal knowledge.").

In an attempt to rebut this record, the Board makes fanciful claims, speculates, and attempts to draw connections where none exist. *See, e.g., In re Grand Jury Proceeding*, 971 F.3d 40, 55 (2d Cir. 2020) (rejecting allegation that subpoena was issued for improper purpose where "claim is at best speculative"); *In re Grand Jury Proc.*, 33 F.3d 1060, 1062 (9th Cir. 1994) (same). Far from being "plain as day" (Mot. at 1), the Board's claim relies on smoke and mirrors.

The "evidence" of an improper motivation for the Subpoenas, proffered by the Board, does not survive even a cursory review. For example, the Board cites (1) a communication by the President referencing potential prosecutions, which mentions "Comey, Adam'Shifty Schiff, Leticia" and (2) a similar statement by the President mentioning Barack Obama, Hillary Clinton, Joe Biden, James Comey, and James Clapper. (Mot. at 10.) Chair Powell's name, however, is conspicuously absent from both lists. Likewise, the Board claims that the day before the Subpoenas were issued the President urged certain United States Attorneys to more quickly advance investigations – suggesting some causal link. (Mot. at 11)

The Board's suggestion is undercut by the fact that the grand jury investigation was opened on ███████████████████████████ and the USAO first contacted the Board about the investigation ████████████ In addition, prior to even contacting the Board, and in an attempt to resolve the matter quietly, the USAO had reviewed all of the nearly 600 documents the Board had previously provided to Congress. *See* Mot. at 12. The USAO, however, deemed them unresponsive to its inquiry given a majority of those documents were from 2019 and 2020, years before the renovation in question had even begun. Last, the Board's citation of a litany of presidential comments is disjointed and its chronology undermines the Board's allegation that such comments establish that the Subpoenas were issued for an improper purpose. For example: (1) the Board cites a reference to an "investigation" of Chair Powell, dated July 2, 2025 (Mot. at

8) – which was *more than* ███ *months before* the USAO opened the grand jury investigation; and (2) the Board cites an announcement of a lawsuit, dated December 29, 2025 (Mot. at 9), which was *after* the USAO had already opened the investigation.[5] At bottom, the Board's insinuation that the Subpoenas were issued as a culmination of a seven-year conspiracy to lower interest rates is dangerously speculative, and its theory as to how issuance of the Subpoenas could affect monetary policy strains credulity.[6]

Ironically, it is the Board that has cynically attempted to inject politics into this matter by strongarming the USAO. First, Chair Powell's lawyer suggested to the USAO that Chair Powell would be likely to step down from the Board when his term as chairman expires – but only if the Subpoenas were withdrawn and the Chair was no longer under investigation. By making this peculiar suggestion, the Board morphed the Subpoenas into the exact thing about which they complain – a mechanism by which Chair Powell could be removed. Second, while the Board previously submitted "nearly 600 documents" for congressional review (Mot. at 12), it has refused to provide a single document in response to the Subpoenas, further demonstrating that, by stonewalling, the Board wishes to politicize the grand jury investigation. Third, it was Chair Powell who chose to publicize this investigation. Last, the Board cites certain public figures' opinions about the issuance of the Subpoenas, as if grand jury investigations are conducted

---

[5]    The Board incorrectly cites to an article from an international news organization to claim the announcement of a lawsuit on December 29. The article does not support such a claim, noting simply that the individual "might" file a lawsuit.

[6]    Even if the Board had established that there is some chance that the Subpoenas were issued in part to harass Chair Powell, the Subpoenas would still be valid because they clearly call for production of materials that are relevant to the grand jury's investigation. *United States v. (Under Seal)*, 714 F.2d 347, 350 (4th Cir. 1983). ("Once it is shown that a subpoena might aid the grand jury in its investigation, it is generally recognized that the subpoena should issue even though there is also a possibility that the prosecutor will use it for some purpose other than obtaining evidence for the grand jury.").

according to punditry, and public opinion is a reason to stop a legitimate investigation or refuse to comply with grand jury subpoenas.[7]  (Mot. at 13-14)

IV.    **Conclusion**

In sum, the Board has not carried its burden of demonstrating that he Subpoenas were issued for an improper purpose, much less that impropriety was the dominate purpose for issuing the Subpoenas.  The Motion to Quash should, therefore, be denied, and the Board should be ordered to comply with the Subpoenas forthwith.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

Steven Vandervelden
N.Y. Bar No. 2191542
601 D Street, N.W.
Washington, D.C. 20530
Steven.Vandervelden@usdoj.gov
(202) 252-7170

---

[7]      What the Board did not mention in its motion was that it was Chair Powell himself who solicited such statements by public figures – statements the Board is now using in its support of its motion to quash. *See, e.g.,* John McCormack, *How Jerome Powell thwarted MAGA lawfare,* WASH. POST, Jan. 15, 2026, available at https://www.washingtonpost.com/ripple/2026/01/15/article/jerome-powell-donald-trump-federal-reserve-senate/?itid=sr_5_db833dd3-d92b-47f3-941d-c1278c8474e3. ("Privately, Powell was working the phones on Sunday and Monday – placing calls to key U.S. senators who had the constitutional power to block any new Trump nominee to serve on the Federal Reserve when the time comes.")