**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

In re Grand Jury Subpoenas Nos.
████████████ & ████████████

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

  Petitioner,

   v.         Miscellaneous Action No. 26-12 (JEB)

UNITED STATES OF AMERICA,

  Respondent.

**MEMORANDUM OPINION**

   This controversy began when the Government issued two grand-jury subpoenas to the Federal Reserve Board of Governors. One demanded records about renovations to Board buildings, while the other sought information on related testimony that the Fed's then-Chair, Jerome Powell, had delivered before Congress. This Court found that the subpoenas were meant to harass Powell and to pressure him to truckle to the President's policy preferences. It also concluded that the Government had no good-faith basis to believe that Powell was guilty of any crime other than displeasing the President and that the Government's justifications were mere pretexts. The Court therefore quashed the subpoenas.

   Instead of appealing, the Government closed its investigation. It now proposes a creative way to clear its loss from the books: it asks this Court to vacate the prior Opinion and Order because any appeal challenging the Court's decision would be dismissed as moot. The Court will deny its Motion.

1

## I.    Background

This case opened against the backdrop of a yearslong pressure campaign waged by President Trump to push Federal Reserve Chair Jerome Powell to lower interest rates.  See In re Grand Jury Subpoenas, --- F. Supp. 3d ---, 2026 WL 710202, at *2–3, *8–9 (D.D.C. Mar. 13, 2026).  As that drumbeat grew louder, the D.C. U.S. Attorney's Office opened a criminal investigation into building renovations that Powell was overseeing and into testimony that he had given to Congress.  Id. at *3.  Prosecutors then issued a pair of grand-jury subpoenas to the Fed's Board of Governors demanding relevant records.  Id.  This Court quashed them, holding that "the subpoenas' dominant (if not sole) purpose [was] to harass and pressure Powell either to yield to the President or to resign and make way for a Fed Chair who will."  Id. at *1.

The Government's response to that ruling has vacillated.  Shortly after the Court released its decision, the Government filed a Motion for Reconsideration, which this Court denied.  See ECF Nos. 21 (Mot. Recons.); 33 (Mem. Op.).  U.S. Attorney Jeanine Pirro meanwhile vowed, "[T]his outrageous decision will be appealed by the United States Department of Justice."  AP, US Attorney Pirro to Appeal Judge's Ruling Against Fed Subpoenas (Mar. 13, 2026), https://bit.ly/4epmZ3R (video at 1:15–22).  No appeal followed.  Yet the Government's investigation pressed on.  On April 14, prosecutors showed up at the site of the renovations that they were probing.  See Matt Peterson, Jeanine Pirro Pursues Fed Pressure While Clock Ticks on Her Appeal in Powell Probe, CNBC (Apr. 15, 2026), https://perma.cc/YY4T-SS54.  On April 22, Pirro once again declared, "I am going forward.  We are appealing the decision of Judge Boasberg."  Kevin Breuninger, Pirro Says DOJ Won't Drop Fed Probe, Will Appeal Judge's Order Blocking Powell Subpoenas, CNBC (Apr. 22, 2026), https://perma.cc/9JL5-89D8.  "We have to find out why" the Board's renovations went so far over budget, she explained.  Id.

2

Two days later, however, she announced that she was closing the case. See US Attorney Pirro (@USAttyPirro), X (Apr. 24, 2026), https://perma.cc/TMY7-G98Q. Yet that very announcement noted that the Fed's Inspector General was examining the renovations and would be issuing a "comprehensive report." Id. "Note well," she warned, "that I will not hesitate to restart a criminal investigation should the facts warrant doing so." Id.

Even with the investigation purportedly closed, the Government has been adamant that it might reopen it. Consider a May 3 interview on CNN with the U.S. Attorney. See generally Forbes Breaking News, "Will You Commit That You Will Not Restart the Investigation?": Pirro Pressed over Powell Probe (YouTube, May 4, 2026), bit.ly/3RSWL0W. Newsman Jake Tapper asked her: "If the Inspector General ultimately does not find any evidence of criminal wrongdoing by Jerome Powell, will you commit that you will not restart the investigation?" Id. at 0:17–26. She declined to make that commitment. Id. at 0:27–1:27. Instead, she pointedly responded, "I spoke to [Fed Inspector General] Michael Horowitz and I would like this [report]" — on the renovations at the center of the investigation — "in short order." Id. at 1:04–08. Tapper pressed her: "So it does not sound like you're committing to, if the Inspector General finds nothing, you won't move forward. It sounds like you're going to keep trying to find out more." Id. at 1:27–34. Pirro essentially confirmed that interpretation: "It depends on what he finds." Id. at 1:35–36.

One day later, the Government filed the current Motion. It argues that, despite its insistence that it could reopen the investigation at any time, it cannot appeal its loss in this Court because any appeal would be dismissed as moot. See ECF No. 35 (Mot.) at 2, 8. It thus asks the Court to vacate the Opinion and Order quashing the subpoenas. Id. at 9.

3

**II.     Analysis**

The Government's request is curious.  This Court cannot decide whether a hypothetical appeal would be moot.  That question can be answered only by the Court of Appeals when (or if) the Government challenges its loss here through the ordinary appellate process.  Yet the Government has never even tried appealing.  Cf. Samma v. U.S. Dep't of Def., 136 F.4th 1108, 1112, 1114–15 (D.C. Cir. 2025) (Government appealing loss and arguing that appeal is not moot).  While this Court cannot answer the question on behalf of the Circuit, it seems far from clear that an appeal would be moot.  Still, because the parties both agree that it would be, see Mot. at 9; ECF No. 36 (Opp.) at 1, the Court takes them at their word and asks whether — if they are right — that would justify vacating its decision.  The Court first tackles what standard governs the Motion, then applies it to this case.

A.     Standard

The Government asks this Court to vacate its earlier decision by using the Court's equitable power over its own judgments and Federal Rule of Civil Procedure 60(b)(6), which authorizes courts to "relieve a party . . . from a final judgment[ or] order" for "any . . . reason that justifies relief."  Fed. R. Civ. P. 60(b)(6); see also Mot. at 1, 3–4 (referring to "Fed. R. Civ. P. 60(b)" in general, but invoking its "omnibus clause" — that is, Rule 60(b)(6) — and citing cases about that subsection); see also United States v. Fiorelli, 337 F.3d 282, 286–88 (3d Cir. 2003) (civil Rule 60(b) is available in criminal cases); United States v. Clark, 984 F.2d 31, 34 (2d Cir. 1993) (same).

The parties, however, exclusively cite cases about a different question: whether an appellate court should vacate a lower court's moot decision — that is, the line of cases descending from United States v. Munsingwear, Inc., 340 U.S. 36 (1950).  That different issue

4

turns on a different source of law with a different text.  An appellate court's power to vacate a lower court's decisions comes from 28 U.S.C. § 2106, while, as just mentioned, a district court's power to vacate its own acts comes from equity and Rule 60(b).  Valero Terrestrial Corp. v. Paige, 211 F.3d 112, 116–17 (4th Cir. 2000); Hall v. Louisiana, 884 F.3d 546, 550 (5th Cir. 2018).  Cases that guide an appellate court's discretion under § 2106 therefore do not bind a district court confronting the separate question of whether to vacate under those independent authorities.  Valero, 211 F.3d at 116–17; Hall, 884 F.3d at 550; Marseilles Hydro Power LLC v. Marseilles Land & Water Co., 481 F.3d 1002, 1003 (7th Cir. 2007); Am. Games, Inc. v. Trade Prods., Inc., 142 F.3d 1164, 1167–70 (9th Cir. 1998).

Thankfully, the difference is less about substance and more about which label applies. Munsingwear vacatur is an equitable remedy and so depends on the same issues that this Court would consider under its inherent powers of equity.  Samma, 136 F.4th at 1115.  As for whether to vacate under Rule 60(b), most circuits that have considered the question hold that the test is the same as under Munsingwear.  Valero, 211 F.3d at 118–21; Hall, 884 F.3d at 551.  Even the one circuit that disagrees still holds that Rule 60(b) vacatur depends on an "equitable balancing test" that basically duplicates the one that Munsingwear prescribes.  Am. Games, 142 F.3d at 1168–69.  That overlap makes sense, and for two reasons.  First, even if the procedural postures and authorizing laws differ, parties are seeking the same equitable remedy of vacatur in both cases.  Its availability thus depends on the same equitable factors.  Second, Rule 60(b) does not lay out substantive standards that govern when vacatur is available; it only creates a mechanism to seek and grant that relief.  See Fed. R. Civ. P. 60 advisory committee's note to 1946 amendment.  Those substantive standards must therefore come from elsewhere, and the law

governing vacatur of decisions on appeal seems like the most logical place from which to pull them.

While it is therefore technically true that Munsingwear precedents do not bind this Court when it considers this Motion, those precedents are still instructive. They explain how to deal with the same problem that the Government alleges exists here: whether to vacate a decision that cannot be reviewed on appeal because the appeal is (or would be) moot. In that context, they identify salient equitable factors, discuss how to apply them, and consider how to weigh them against one another. Like the parties, the Court will therefore draw on the Munsingwear cases to guide its judgment.

B.        Application

It is worth noting at the outset that vacatur is an "extraordinary" remedy, and there is a "general presumption against" it. Valero, 211 F.3d at 118; accord U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 26 (1994). When courts decide whether to vacate a decision that is unreviewable because of mootness, they consider the circumstances that caused the mootness, the balance of the equities, and the public interest. Azar v. Garza, 584 U.S. 726, 729–30 (2018); Bancorp, 513 U.S. at 26. The Court starts with the factors weighing against vacatur, then turns to the other side of the scale.

One weighty argument against vacating is that the Government chose to create the mootness of which it now complains. The Munsingwear caselaw holds that in such circumstances, vacatur is less appropriate. When courts do vacate moot decisions under that doctrine, it is generally to protect parties whom a court ruled against, who then tried to challenge that decision on appeal, but who "lost that opportunity due to happenstance." Camreta v. Greene, 563 U.S. 692, 712 n.10 (2011). By contrast, when a party seeks vacatur because it chose

6

to moot the case — as the Government did here — it "voluntarily forfeit[s]" its potential appeal. Bancorp, 513 U.S. at 25; see also Ctr. for Sci. in the Pub. Int. v. Regan, 727 F.2d 1161, 1166 (D.C. Cir. 1984) (when party moots its own appeal, "it is in no position to complain that its right of review of an adverse lower court decision has been lost") (cleaned up).  To be sure, there might still be good reasons to grant that party vacatur, which is not categorically off limits in such cases.  Samma, 136 F.4th at 1115.  Yet courts are skeptical of that gambit: such a party must show "exceptional circumstances" justifying the remedy.  Id. (quotation marks omitted).

The Government tries to muddy the issue by arguing that those holdings from Munsingwear cases do not apply to this Court's balancing of the equities under Rule 60(b).  See ECF No. 39 (Reply) at ECF pp. 1–2.  It misunderstands the import of those decisions here.  As discussed above, the Court agrees that they do not control.  Bancorp and similar cases matter, instead, because they manifest a broader principle that does apply here: courts are reluctant to rescue a party from a problem that it chose to create.  The Government opted to close its investigation, it decided not to even try appealing, and it now complains that the consequences of its choices are unfair.  That conduct does not necessarily foreclose relief, but — in an equitable balancing — it certainly weighs against vacatur.

Other equities do, too.  Consider the interests of the Board, which has a clear stake in preserving a decision that it litigated and won.  Also consider the public interest, which likewise pulls against vacatur.  That interest is served by leaving the decision on the books to guide future litigants, help other courts grappling with similar issues, and develop the law.  Bancorp, 513 U.S. at 26; Mahoney v. Babbitt, 113 F.3d 219, 222–23 (D.C. Cir. 1997); In re United States, 927 F.2d 626, 628 (D.C. Cir. 1991).  If the Government got its way here, then any party that lost a court case could choose to moot the matter, erase an unfavorable decision, and freeze the accumulation

and refinement of precedents on which our legal system depends.  While this (mere) district-court decision will admittedly not create binding precedent, its reasoning still offers a public good from which other parties and judges may draw.

On the other side of the scale, the arguments for vacatur are especially weak.  "The point of vacatur is to prevent an unreviewable decision 'from spawning any legal consequences,' so that no party is harmed by" a decision that could not be challenged on appeal.  Camreta, 563 U.S. at 713 (quoting Munsingwear, 340 U.S. at 41).  That risk, however, varies greatly across cases.  Because vacatur is an equitable remedy whose availability depends on a close examination of each case's facts and circumstances, Samma, 136 F.4th at 1115; Bancorp, 513 U.S. at 24, 29; Azar, 584 U.S. at 729, courts should not mechanically assume that these worries lurk equally within every moot decision.  They should instead scrutinize how serious a problem those legal consequences might be given the realities of the case at hand.

Here, the potential for legal consequences — that is, the entire basis for vacatur — is unusually low.  Moot decisions can leave behind two effects: precedent and preclusion.  As for precedent, this Court's opinions have no precedential effect and so will not bind the Government in future cases.  Camreta, 563 U.S at 709 n.7.

As for preclusion, the Government faces a negligible risk of it in litigation against the Board and no risk whatsoever in suits against others.  Start with preclusion between the parties.  If this case is truly moot, then there is no reasonable expectation that the Government and the Board will find themselves litigating these subpoenas again.  Of course, one can imagine other cases in which a moot decision would continue to bind the parties — take Munsingwear itself, where the Government had sought damages and an injunction against the same defendant.  See 340 U.S. at 37.  The lower court held that the Government was not entitled to an injunction

because the defendant had not broken the law, and that decision became moot on appeal, but the court's finding on liability still precluded the Government from arguing that it was entitled to damages. Id. at 37–38. Here, by contrast, no issues remain to litigate, so no risk of preclusion looms.

Even if the parties revive their dispute, the risk of preclusion is especially low because the Court's prior decision was especially fact bound. The Court found that these subpoenas investigating these matters bore an improper purpose, given the strength of the evidence at that point. Grand Jury Subpoenas, 2026 WL 710202, at *8–10. If any of those facts change — say, if the Inspector General's report creates more reason to think that Powell committed a crime — then future issues would not have been decided by this Court and so will not be fixed in place by issue preclusion. So much for preclusion between the parties.

What about nonmutual issue preclusion — that is, the risk that in a future case, some third party might use the unvacated decision to argue that the Government is bound by any adverse findings from this Court? That could be a reason to vacate in a different case. But not this one, as nonmutual issue preclusion does not run against the Federal Government. Standefer v. United States, 447 U.S. 10, 21–25 (1980) (criminal cases); United States v. Mendoza, 464 U.S. 154, 162–63 (1984) (civil cases).

In sum, the allegedly moot decision creates no precedential effect and no preclusive effect beyond the parties. One could conceivably concoct some scenarios in which it could produce preclusion between the parties, but it takes some cockeyed speculation. Even that possibility is not necessarily an argument for vacatur when the party that lost unilaterally mooted the case. To say that the Court's decision might affect future litigation between the Board and the Government is to say that the Board might keep the benefit of a decision that it won. If its

9

adversary could destroy that protection by choosing to moot the case, that would be inequitable indeed. Staley v. Harris County, 485 F.3d 305, 313 (5th Cir. 2007); Ctr. for Sci. in the Pub. Int., 727 F.2d at 1166 (when losing party unilaterally moots case, "the prevailing party . . . ought to be left in the same position" — that is, with benefit of its win); United States v. Garde, 848 F.2d 1307, 1310 (D.C. Cir. 1988) (courts should "avoid unfairness to parties who prevailed"). The reasons to preserve the Court's decision thus "greatly exceed[] the light, if existent, danger of unfair preclusive effect." Mahoney, 113 F.3d at 224.

The Government's counterarguments change none of this. It contends that "[v]acatur is especially appropriate where a published decision in a moot case addresses important constitutional issues." Mot. at 4. Even if that were true, it does not describe the decision here. The Court held that these subpoenas were issued for an improper purpose and so quashed them under Federal Rule of Criminal Procedure 17(c)(2). Grand Jury Subpoenas, 2026 WL 710202, at *5, *10. It did not interpret, or even cite, a single constitutional provision (other than briefly noting that standing to quash a grand-jury subpoena is not required by Article III, id. at *4, hardly an earth-shaking constitutional pronouncement). The Government shoots back that the Opinion "implicates important separation-of-powers concerns." Mot. at 4. Yet the Supreme Court has long held that "the powers of the grand jury are not unlimited and are subject to the supervision of a judge." Branzburg v. Hayes, 408 U.S. 665, 688 (1972). When this Court restrained those powers, it was not testing an uncertain line but merely following precedent that has been well settled for decades. The Government tries again by asserting that "the Court's decision implicates complicated First Amendment issues" — namely, the issue of using the President's statements to infer prosecutors' motivations. See Mot. at 5. The Court struggles, however, to see the constitutional problem with using someone's speech as evidence of his

10

thoughts, or with using the President's explicit statements as evidence of what his deputies understood that he wanted.  Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993).

Finally, the Government says that this Court should vacate because it did not moot the case to avoid appellate review.  See Mot. at 7.  Perhaps, but that cannot overcome the factors discussed above.

## III.     Conclusion

Because the equities weigh overwhelmingly against vacatur, the Court will not vacate its prior Opinion and Order.  An Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  June 11, 2026

11